**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| KEYSTONE DRILL SERVICES, INC., | CASE NO. 5:22-CV-00291 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| DAVEY KENT, INC., *et al*., | <u>**MEMORANDUM OPINION & ORDER**</u> |
| Defendants. | |

Before the Court is the Defendant J. Thomas Myers II's ("Defendant" or "Myers")

Motion for Summary Judgment.  (ECF Doc. 58 ("Motion").)  The Motion is briefed and ripe for

decision.  (ECF Docs. 59, 62.)  The parties have consented to the magistrate judge pursuant to 28

U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 30.)  For the reasons set forth below, the

Court **DENIES** Myers's Motion (ECF Doc. 58).

## I.  Background

### A.  Procedural Background

Plaintiff Keystone Drill Services, Inc. ("Plaintiff" or "Keystone") filed its Complaint

against Defendants Davey Kent, Inc. ("Davey Kent") and Myers on January 21, 2021, in the

Common Pleas Court of Somerset County Pennsylvania.  (ECF Doc. 1-3.)  In its Complaint,

Keystone asserts claims for breach of factoring agreement and guaranty (Count Four) and fraud

(Count Six) against Davey Kent and Myers, in addition to claims for breach of contract, unjust

1

enrichment, conversion, and constructive trust against Davey Kent alone (Counts One, Two, Three, and Five), all of the claims arising from Keystone's purchase of drill rigs and component parts from Davey Kent.  (*Id*.)  That action was removed to the United States District Court Western District of Pennsylvania on March 1, 2021 (ECF Doc. 1) and subsequently transferred to this Court on February 22, 2022 (ECF Docs. 17, 18).  In addition to ordering the transfer of the action to this Court, the Western District of Pennsylvania stayed Keystone's claims against Davey Kent due to its "Notice of Bankruptcy Filing," but held that Keystone could continue to prosecute its claims against Myers individually despite the bankruptcy stay.  (ECF Doc. 17, p. 3.)

Following transfer to this Court, the parties consented to the undersigned's jurisdiction. (ECF Doc. 30.)  Plaintiff filed an Amended Complaint on October 19, 2022, to clarify allegations regarding Keystone's legal structure.  (ECF Docs. 36, 37.)  The legal claims asserted in the Amended Complaint were unchanged.  (*Compare* ECF Doc. 37 *with* ECF Doc. 1-3, *see also* ECF Doc. 59, p. 2, n. 1.)  The parties proceeded with discovery and participated in an unsuccessful mediation.  (ECF Doc. 54.)  Following the mediation, Plaintiff's request for additional time to conduct discovery was granted and Myers's request to file a motion for summary judgment at the conclusion of discovery was granted.[1]  (ECF Doc. 55.)  Myers filed the pending motion for summary judgment on June 30, 2023.  (ECF Doc. 58.)

## B.    Factual Background

### 1.    Myers and Davey Kent

Myers is the owner and President of Davey Kent, a small business that employs less than two dozen individuals.  (ECF Doc. 58-1 ("Myers Aff."), p. 1, ¶ 2; *id*. at p. 2, ¶ 6.)  Davey Kent manufactures large drilling rigs for use in commercial construction, oil drilling, and related

---

[1] In light of the parties' interest in engaging in mediation, Myers's first motion for summary judgment was denied without prejudice subject to the right to refile should the case not settle.  (ECF Doc. 53.)

industries (*Id*. at p. 1, ¶ 3) and is run by Myers and his son, David Myers (*id*. at p. 2, ¶ 6). David

Myers is the Vice President and an employee of Davey Kent, not an owner. (ECF Doc. 60-1

("Myers Depo. Vol. I"), Page ID # 379-80, pp. 27:20-28:3.)[2]

Drilling machines have historically been made to order in the United States, and can

therefore take weeks, if not months, to manufacture, while large European manufacturers build

"prefabricated fleets of less-customizable machines for near-immediate purchase and

installation." (Myers Aff., p. 2, ¶¶ 8-9.) Following the 2008 recession, European manufacturers

began shipping those prefabricated, less expensive machines to the United States, causing a shift

in the drilling machine industry. (*Id*. at p. 2, ¶¶ 7, 10-11; Myers Depo. Vol. I, Page ID # 413-15,

pp. 61:15-63:9.) That shift complicated Dave Kent's "increasingly precarious position," so that

increasing supply chain costs and delays began to negatively impact Davey Kent's cash flow.

(Myers Aff., p. 2, ¶¶ 11-12.)

**2.    Keystone**

Keystone's President is Tom Walker ("Walker") and its CEO is Scott Slater (Slater").

(ECF Doc. 59-2 ("Slater Aff."), p. 2, ¶¶ 1, 4.) Keystone is a company that manufactures custom-

engineered drilling products for industrial uses and acts as a sales representative for drilling

products produced by drill manufacturers around the world. (*Id*. at p. 2, ¶ 2.)

**3.    Distributorship Agreement Between Davey Kent and Keystone**

In or around 2017, Slater connected with David Myers via LinkedIn, with the hope that

"Davey Kent could manufacturer drilling equipment which Keystone would pay for and then sell

for a profit to its customers." (Slater Aff., p. 2, ¶ 3.) Myers agrees that Slater approached David

Myers in 2017 to discuss "entering into a distributorship agreement where Keystone would

---

[2] The listed page numbers for the Myers deposition refer to the page numbers on the transcript pages, not the pages listed electronically on ECF Doc. 60-1; Page ID numbers are included to reference the pages in the electronic file.

establish an available fleet of Davey Kent machines and parts for sale and rental in the industry, market the availability of those machines, and collect a fee for itself."  (Myers Aff., p. 3, ¶ 13.) Walker and Slater met with Myers and his son David at Davey Kent's facility on July 6, 2017, to discuss a potential business relationship between Davey Kent and Keystone.  (Slater Aff., p. 2, ¶ 4; *see also* Myers Aff., p. 3, ¶ 14.)  Another meeting took place on August 8, 2017, at Keystone's facility; Myers and his son David were present on behalf of Davey Kent, and Walker, Slater, and Steve Means were present on behalf of Keystone.  (Slater Aff., p. 2, ¶ 4.)

During the two meetings, Keystone expressed interest in purchasing two types of drilling machines designed and manufactured by Davey Kent, a smaller 525 machine and a larger 725 machine.  (Slater Aff., p. 2, ¶ 5.)  Once the machines were delivered, Keystone intended to sell them to customers within a defined territory negotiated by the parties.  (*Id*.)  Based on those discussions, Keystone and Davey Kent executed a Distributorship Agreement in August 2017. (*Id*. at p. 3, ¶ 18; Slater Aff., p. 3, ¶ 6; ECF Doc. 37-1.)  The agreement was signed by David Myers on behalf of Davey Kent and by Scott Slater on behalf of Keystone.  (Myers Depo. Vol. I, Page ID # 427, p. 75:6-12; ECF Doc. 37-1, p. 6.)  Myers approved the agreement before it was signed by David Myers.  (Myers Depo. Vol. I, Page ID # 427-28, pp. 75:22-76:7.)

The Distributorship Agreement stated that Keystone would "work to build an appropriate fleet to be made available at all times for sale or rent in the contractual area."  (ECF Doc. 37-1, p. 3 (Article 3(b)).)  The parties agreed that the fleet size would start at two machines, but expected that the fleet would grow much larger.  (*Id*.; Slater Aff., p. 3, ¶ 6.)  During the contract discussions, Myers portrayed Davey Kent as a small company that had to build machines on an "order for order" basis; that is why a decision was made to start with only two machines.  (Slater Aff., p. 7, ¶ 7.)  Nevertheless, Slater states that Myers represented multiple times during the

4

contract discussions that Davey Kent had the personnel and money to fulfill Keystone's orders (*id.*), and "did not disclose to Keystone that he and Davey Kent were in financial difficulty" (*id.* at p. 3, ¶ 9).

Keystone ordered its first 725 and 525 machines in August 2017.  (Myers Aff., p. 4, ¶ 24.)  The purchase order for the first 725 machine was executed on August 17, 2017, in the amount of $439,819.75.  (Slater Aff., p. 3, ¶ 8.)  The purchase order for the first 525 machine was executed on August 18, 2017, in the amount of $206,261.00.  (*Id.*)  Keystone fully paid for these two machines.  (*Id.*)  In September 2017, Keystone ordered a second 525 machine at the cost of $214,650.50, and Keystone paid $107,325.26 towards that machine.  (*Id.*)  According to Slater, "Myers said it would take approximately two to three months to build a 525 machine and four months and likely longer to build a 725 machine."  (*Id.* at p. 3, ¶ 7.)  Keystone needed Davey Kent to "timely manufacture and deliver the drills as it needed the machines to sell to recoup its purchase costs and to generate profit," and therefore "expected Davey Kent would timely build and deliver those drills and others as Myers had promised."  (*Id.* at p. 3, ¶¶ 7-8.)

After entering into the Distribution Agreement, Davey Kent started to explore additional ways to obtain "upfront capital," believing additional capital would permit it to "order more parts in advance, shortening vendor supply-chain delays."  (Myers Aff., p. 5, ¶¶ 30, 31.)  Alternatives for obtaining additional capital that were considered by Davey Kent included "leasing machines through Bank of the Internet and the use of factoring agreements."  (*Id.*)

### 4.     Factoring Agreement

A few days after the Distribution Agreement was signed, Myers forwarded a copy of the agreement, invoices for the first two machine purchases, and a screenshot showing Keystone's initial 30% deposits toward those machines to Michael Sichenzia ("Sichenzia").  (Myers Depo.

Vol. I, Page ID # 437-42, pp. 85:9-90:15; ECF Doc. 60-1, pp. 277-98 (Exs. 8A-8E).)

Sichenzia—a consultant for Myers on personal matters who was previously convicted of fraud-

related charges—used those materials to connect Davey Kent with Durham Commercial Capital,

a factoring company.  (Myers Depo. Vol. I, Page ID # 391-400, pp. 39:17-48:5, 88:9-89:5.)

Davey Kent's purpose in pursuing factoring was to "accelerate cash into the company to help [it]

perform on [its] commitments to Keystone" (*id.* at Page ID 437-38, pp. 85:24-86:6), and to "[t]ry

to move things faster" by "powering against the orders and the equipment that were in process"

(*id*. at Page ID # 441, p. 89:16-22).

      Myers first got to know Sichenzia "just prior to discussions with Keystone" and knew

that he was a felon and had spent some time in jail.  (Myers Depo. Vol. I, Page ID # 391-92, pp;

39:20-40:2.)  Myers did not tell Keystone that he was being advised by a convicted felon.  (Slater

Aff., p. 3, ¶ 9.)  Slater states that Keystone would not have signed the contract, placed the

purchase orders, or otherwise done business with Myers or Davey Kent if Keystone knew

"Myers and Davey Kent were in financial difficulty and that Myers was being advised by

Sichenzia."  (*Id.* at p. 4, ¶ 9.)

      On September 21, 2017, Davey Kent and Durham Commercial Capital Corp. ("Durham")

signed a Nonrecourse Receivables Purchase Contract and Security Agreement ("Factoring

Agreement"), with a personal guaranty signed by Myers ("Guaranty").  (ECF Doc. 37-3; Myers

Depo. Vol. I, Page ID # 458, p. 106:1-13; ECF Doc. 60-1, pp. 340-54 (Ex. 15B); Myers Aff., p.

5, ¶ 32.)  Through the Factoring Agreement, Durham agreed to purchase certain of Davey Kent's

accounts receivable.  (ECF Doc. 37-3; ECF Doc. 60-1, pp. 340-54 (Ex. 15B).)  Specifically,

Davey Kent factored the three machines that had been ordered by Keystone; two 525 machines

and one 725 machine.  (*Id.* at p. 5, ¶ 34; Myers Depo. Vol. I, Page ID # 443, p. 91:3-18.)  The

Factoring Agreement required Davey Kent to produce and ship the factored products within a particular time schedule. (Myers Aff., p. 5, ¶ 33.) Davey Kent proposed a $480,000.00 line of credit under the Factoring Agreement, but Durham agreed to provide a $350,000.00 line of credit. (Myers Depo Vol. I, Page ID # 452-53, pp. 100:18-101:8.) Davey Kent entered the Factoring Agreement with Keystone's knowledge and consent. (Myers Aff., p. 5, ¶ 34.) Keystone agreed to the Factoring Agreement based on Myers's representations that "the Factoring Agreement had nothing to do with Keystone and would help fund the construction of Keystone's machine orders." (Slater Aff., p. 4, ¶ 10.)

### 5. Production Delays, Additional Orders, and Financing Proposals

While Davey Kent was starting to manufacture Keystone's first 725 and 525 machines, Keystone pursued a lead provided by Davey Kent and sold one of the "intended fleet machines." (Myers Aff., p. 4, ¶ 25.) That machine needed "significant reconfiguring to meet the client's needs." (*Id*. at p. 4, ¶ 26.) Slater avers that Keystone had to purchase a 525 machine from another source to meet that customer's needs because Davey Kent did not timely deliver the initial 525 machine. (*Id*. at p. 4, ¶ 12.)

Myers avers that delays in the production of the initial 525 machine resulted when Keystone: removed the "fleet machine" from the "intended fleet, sold [it], and demanded that Davey Kent reconfigure it"; then "unnecessarily pushed for delivery of the machine before it was needed"; then "rashly chose to purchase a used unit from a third party"; and finally "asked Davey Kent to reconfigure the used machine and to remove components from the previously-ordered machine." (Myers Aff., p. 5, ¶¶ 35-36.) Myers asserts that these actions paused the production of the initial 525 machine, even causing production to take "steps backwards," and complicated the Factoring Agreement. (*Id*. at pp. 5-6, ¶¶ 37-38.) The first 525 machine ordered by Keystone in August 2017 was not delivered until March 2018. (Slater Aff., p. 5, ¶ 14.)

7

In October 2017, David Myers emailed Slater regarding the possible use of financing to enable Keystone to order multiple machines without large outlays of money.  (ECF Doc. 60-1, pp. 406-14 (Ex. 30); *id.* at pp. 426-27 (Ex. 32).)  At his deposition, Myers explained that he and Sichenzia were exploring the possibility of "putting together a leasing program that would allow Keystone to place more orders without putting as much money upfront" using the Bank of the Internet as a financing company.  (Myers Depo. Vol I, Page ID # 495-97, pp. 143:18-145:21; ECF Doc. 60-1, pp. 406-14 (Ex. 30).)  When asked at his deposition whether Davey Kent was "trying to push the relationship along with more orders," Myers answered: "More orders, which was stated at the very beginning of the relationship. That's where we wanted to take it."  (Myers Depo. Vol I, Page ID # 501, p. 149:16-25.)

In December 2017, David Myers emailed Slater and Walker at Keystone regarding delays in Davey Kent's production of machines and the need for cash and/or return on investment. (ECF Doc. 60-2, pp. 94-95 (Ex. 37).)  He indicated that "serious delays in components ha[d] had the effect of necessarily drawing Davey out on cash" and "implore[d] Keystone to consider the Bank of the Internet arrangement," noting that the arrangement "could even be used with the current machines on order" and "could include another couple of machines for the 2018 production schedule."  (*Id.*)  He explained: "This puts necessary cash into our operation to continue moving equipment through to completion and will reduce the amount of money that is out of the Keystone pocket."  (*Id.*)  In his deposition, Myers explained that Davey Kent thought financing to get the machines built was something they should explore.  (ECF Doc. 60-2 ("Myers Depo. Vol. II"), Page ID # 835-36, pp. 220:17-221:4.)  Slater explains that Keystone did not agree to the Bank of the Internet leasing proposal "because it placed Keystone in the position to

8

have to finance the manufacture of machines it had already paid for."  (Slater Aff., p. 4, ¶ 11; *see also* Myers Depo. Vol. II, Page ID #836, pp. 221:5-7 (agreeing that "Keystone said no").)

Slater avers that "Myers . . . continued to promise performance and press for more machine orders," despite Davey Kent's failure to timely deliver the initial 525 machine.  (Slater Aff. p. 4, ¶¶ 12-13.)  "In reliance on Myers' promises and recognizing that a larger fleet of machines would be necessary for the relationship to work," Slater states that "Keystone ordered a second 725 machine and third 525 machine in January 2018 for purchase prices of $439,819.75 and $214,992.50, respectively, and made substantial initial payments for those drills."  (*Id*. at pp. 4-5, ¶ 13.)

### 6.    Forbearance Agreement and Assignment of Factoring Agreement

Davey Kent entered into a forbearance agreement for the Factoring Agreement with Durham on February 7, 2018.  (Myers Aff., p. 6, ¶ 39; ECF Doc. 58-5.)  By March 2018, despite receipt of substantial sums from Keystone, Davey Kent had still delivered only one of the machines Keystone had ordered—the first 525, which was ordered in August 2017.  (Slater Aff., p. 5, ¶ 14.)  Because of Davey Kent's failure to perform as promised, and to protect Keystone's position in relation to other creditors, Keystone purchased an assignment of the Factoring Agreement and Myers's personal guaranty from Durham ("Assignment Agreement") in March or April 2018.  (*Id.* at p. 5, ¶ 15; ECF Doc. 37-4 (Assignment Agreement dated March 23, 2018); Myers Aff., p. 6, ¶ 40; ECF Doc. 58-6 (April 2018 email advising of assignment to Keystone); ECF Doc. 58-7.)  Keystone paid $214,815.96 for the assignment, which it understood to be the amount Davey Kent and Myers owed to Durham at that time.  (Slater Aff., p. 5, ¶ 15.)

Keystone's purchase of the Factoring Agreement and Guaranty made Keystone both a customer and a creditor of Davey Kent.  (Myers Aff., p. 6, ¶ 41.)  At the time of the purchase,

Myers asserts that Davey Kent was in compliance with its forbearance agreement with Durham. (Myers Aff., p. 6, ¶ 42.)  After the purchase, Myers asserts that Keystone took no steps to abide by the terms of the Factoring Agreement, "did not adhere to any obligations owed to Davey Kent, cutoff Davey Kent from additional funding under the factoring agreement (despite its admission that Davey Kent had not exhausted the line of credit), and failed to return or credit to Davey Kent any of the reserve holdbacks under the agreement." (*Id*. at p. 6, ¶¶ 43-44.)

### 7. Termination of Contract

On January 31, 2019, Keystone terminated its Distributorship Agreement with Davey Kent.  (Slater Aff., p. 5, ¶ 15; ECF Doc. 59-2, pp. 7-8.)  Pursuant to that agreement, Davey Kent had delivered the first 525 machine ordered by Keystone and some parts.  (Slater Aff., p. 5, ¶¶ 14, 16.)  But Davey Kent did not deliver the other four machines ordered by Keystone, and failed to fully deliver various parts Keystone had ordered and paid for in advance.  (Slater Aff., p. 4, ¶ 11; *id.* at p. 5, ¶¶ 14, 16; *id.* at p. 6, ¶ 17.)  According to Keystone's accounting, "Keystone paid Davey Kent and Durham $1,025,933.40 for the five machines and parts it ordered, not including the payment to Durham for the assignment of the Factoring Agreement and Guaranty, nor the payment for another 525 machine purchased because Davey Kent did not timely deliver." (*Id.* at p. 5, ¶ 16; ECF Doc. 59-2, pp. 9-11 (Ex. 2).)

In the fall of 2019, Davey Kent agreed to sell the initial 725 machine that had been ordered by Keystone to Malcolm Drilling, who paid approximately $180,000.00 towards a purchase price of approximately $450,000.00, but later canceled the order when Davey Kent could not timely make delivery.  (Myers Depo. Vol. II, Page ID # 801, p. 186:15-22; *id.* at Page ID # 806-08, 191:12-193:16; *id.* at Page ID # 809-14, 194:23-199:7.)  Davey Kent ultimately

10

sold and delivered the same 725 machine to Michels for $453,000.00, in September 2019 or 2020. (*Id*. at Page ID # 814-15, pp. 199:8-200:21.)

## C. Keystone's Claims Against Myers

Keystone's claims against Myers are set forth in Counts Four and Six of the Amended Complaint. (ECF Doc. 37, pp. 8-10, 11-12.) All six counts in the Amended Complaint also include allegations and seek judgment against Davey Kent (ECF Doc. 37), but those claims are stayed based on Davey Kent's "Notice of Bankruptcy Filing" (ECF Doc. 17, p. 3). Thus, the only claims presently before this Court are the claims asserted against Myers individually.

### 1. Count Four – Breach of Factoring Agreement and Guaranty

In Count Four, Keystone alleges that Myers signed a Guaranty of Payment as part of the Factoring Agreement, which he breached when Davey Kent failed to pay Durham $214,815.06 due under the Factoring Agreement after Keystone made a payment in that same amount to Davey Kent. (ECF Doc. 37, pp. 8-10, ¶¶ 43-51.) Keystone seeks judgment in its favor and against Myers in the amount $214,815.96, plus attorney's fees and disbursements, costs, statutory interest, and any other relief that the Court deems just and proper. (*Id*. at p. 10.)

### 2. Count Six – Fraud

In Count Six, Keystone alleges that Myers made "fraudulent misrepresentations to Keystone to induce Keystone to purchase drills and pay money for them." (ECF Doc. 37, p. 11, ¶ 57.) Keystone further alleges that "Myers viewed Keystone as a source of funds to keep their business afloat" and made knowing misrepresentations "with the intent of misleading Keystone into paying money for drills Davey Kent knew it would not deliver." (*Id*. at p. 11, ¶ 63.) Keystone alleges that it justifiably relied on misrepresentations by Myers and suffered resulting damage in the amount $622,606.68, asserting that Myers is "liable in his personal capacity

11

because he derived a personal benefit from defrauding Keystone" and noting that Myers "guaranteed performance under the Factoring Agreement and it was in his personal interest to induce Keystone to keep paying Davey Kent, as the Keystone receivables were the subject of the Factoring Agreement and the collateral that secured the line of credit from Durham."  (ECF Doc. 37, p. 12, ¶ 65.)  Keystone further alleges that Myers's fraud "was willful, wanton, malicious and spiteful," and therefore entitles Keystone to collect punitive damages and attorney's fees.  (*Id*. at p. 12, ¶ 66.)  Keystone seeks judgment in its favor and against Myers in the amount of $622,606.68, punitive damages and attorney's fees, costs, statutory interest, and any other relief that the Court deems just and proper.  (ECF Doc. 37, p. 12.)

## II.    Summary Judgment Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323 (1986) (internal quotations omitted).

After the moving party has carried its initial burden to show that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986).  "Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Id.* at 587 (internal quotations, citations, and alterations omitted).  However, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.  The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial.  *Id.* at 587. "The 'mere possibility' of a factual dispute is not enough."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "A genuine issue for trial exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Muncie Power Prod., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248).  Thus, for a plaintiff to avoid summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  In determining whether summary judgment is warranted, a judge generally asks "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  *Id.* (internal citations, emphasis, and bracket omitted).

### III.    Discussion

Although Myers states in his conclusion that both claims asserted against him in the Amended Complaint (Counts Four and Six) "fail[] as a matter of law" (ECF Doc. 58, p. 13), his "Law and Argument" analysis is limited to the fraud claim (Count Six) (*id.* at pp. 9-13).  Myers's analysis of the guaranty claim (Count Four) is limited to a general assertion in his statement of facts that "Keystone's inability to establish an amount owed by Davey Kent under the factoring agreement precludes any finding against him for personally guaranteeing a default by Davey Kent."  (ECF Doc. 58, p. 9.)  This argument is conclusory and underdeveloped, and any intended challenge to Count Four on summary judgement is therefore deemed waived.  *See McPherson v.*

*Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997); *see also Celotex Corp.*¸ 477 U.S. at 323 (holding that the party seeking summary judgment bears the initial burden of informing the Court "of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact"). Thus, to the extent Myers seeks summary judgment as to Count Four, his motion is **DENIED**.[3]

In seeking summary judgment as to the fraud claim in Count Six, Myers argues: (1) that Keystone cannot establish a genuine issue of material fact as to whether Myers made fraudulent misrepresentations because Keystone "cannot point to any misrepresentations made by Myers" (ECF Doc. 58, pp. 10-11; ECF Doc. 62, pp. 3-4); and (2) that Keystone "was required, and failed, to allege and prove the elements necessary to pierce the corporate veil" (ECF Doc. 58, pp. 11-13.) The Court will address these arguments in reverse order.

### A.    Whether Keystone Must Pierce the Corporate Veil to Recover on its Fraud Claim

Myers argues that Keystone cannot hold him "personally liable for his statements and actions as a representative of Davey Kent" unless it can first "establish the piercing of the corporate veil." (ECF Doc. 58, pp. 11-13.) Keystone responds that its fraud claim against Myers "does not depend on veil piercing." (ECF Doc. 59, pp. 12-13.)

---

[3] Even if the Court did not find Myers waived his arguments for summary judgment on Count Four, Keystone correctly observes that Myers has only challenged the amount of damages to be recovered under the claim, not the validity of the Guaranty or Keystone's legal right to collect under the Guaranty. (ECF Doc. 59, pp. 11-12.) "Questions raised concerning damages are essentially questions of fact." *Ferndale Lab'ys, Inc. v. Schwarz Pharma, Inc.*, 123 F. App'x 641, 648 (6th Cir. 2005) (alterations and quotations in original removed); *see also Stryker Corp. v. Ridgeway*, No. 1:13-CV-1066, 2015 WL 8759220, at \*14 (W.D. Mich. Dec. 14, 2015) (finding non-moving party presented evidence sufficient to create material issue of fact for trial as to damages). Here, Keystone has submitted evidence that the amount it seeks to recoup under the Guaranty is the amount it paid to Durham, as Slater avers: "Keystone paid $214,815.96 for the assignment which Keystone understood to be the amount owed by Davey Kent and Myers to Durham." (Slater Aff., p. 5, ¶ 15.) Since the amount of damages recoverable by Keystone under the Guaranty is a question of fact and Keystone has presented evidence of damages sufficient to preclude summary judgment on Count Four, any argument for summary judgment as to Count Four also fails on its merits.

"Generally, an individual officer or shareholder will not be held liable for the acts or debts of a corporation." *Prymas v. Kassai*, 168 Ohio App. 3d 123, 136 (2006) (citing *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 287 (1993)). But an exception applies, and the corporate veil may be pierced, "when an individual officer possesses: '(1) control over the corporation . . . so complete that the corporation had no separate mind, will, or existence of its own, (2) control over the corporation . . . exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) [an] injury or unjust loss resulted to the plaintiff from such control and wrong.'" *Id.* (quoting *Belvedere*, 67 Ohio St.3d at paragraph 3 of syllabus).

Further, "Ohio law recognizes corporate officers may be liable in their individual capacity for acts of fraud." *Mkparu v. Ohio Heart Care, Inc.*, 138 Ohio App. 3d 7, 27 (1999) (citing *Heritage Funding & Leasing Co.* 120 Ohio App.3d 422, 430 (1997)); *see also Prymas*, 168 Ohio App. 3d at 136 ("There is support for the proposition that '[d]irectors and corporate officers generally may be personally liable for fraud even though the corporation may be liable also.'" (quoting *Centennial Ins. Co. of N.Y. v. Vic Tanny Internatl. of Toledo, Inc.*, 46 Ohio App. 2d 137, 141 (1975)); *Hitachi Med. Sys. Am., Inc. v. Horizon Med. Grp.*, Case No. 5:07CV02035, 2008 WL 11380232, *4 (N.D. Ohio October 29, 2008) (explaining that a director or corporate officer "'may be personally liable for fraud even though the corporation may be liable also'") (quoting *Prymas* and *Centennial Ins. Co.*); *Baker v. Pfeifer*, 940 F. Supp. 1168, 1184 (S.D. Ohio 1996) (same). "This liability extends to torts committed by or for the corporation when the officer has participated in the wrong." *Prymas*, 168 Ohio App. 3d at 136.

"'To fasten personal liability upon a corporate officer for fraud, it must be shown that he knew the statement was false, that he intended it to be acted upon by the parties seeking redress,

and that it was acted upon to the injury of the party.'"  *Hitachi Med. Sys. Am., Inc.*, 2008 WL 11380232, at *4 (quoting *Centennial*, 46 Ohio App. 2d at 141); *see also Baker*, 940 F. Supp. at 1184 (same).  Thus, a corporate officer such as Myers may be held liable in his individual capacity for fraud, regardless of whether the corporate veil can be pierced.  Accordingly, Myers's argument regarding the piercing of the corporate veil is not dipositive of the fraud claim.

**B.**    **Whether Genuine Issues of Material Fact Preclude Summary Judgment in Myers's Favor on Plaintiff's Fraud Claim (Count Six)**

Myers argues that he is entitled to summary judgment on Count Six because Keystone "cannot point to any misrepresentations made by Myers" and therefore cannot prove fraud. (ECF Doc. 58, p. 11; ECF Doc. 62, pp. 3-4.)  Keystone argues in response that "there is sufficient evidence to withstand summary judgment that Myers defrauded Keystone into paying money for machines he knew Davey Kent had no ability to deliver."  (*Id.* at pp. 13-15.)

To establish fraud, a plaintiff must show: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation; and (6) a resulting injury proximately caused by the reliance."  *Hitachi Med. Sys.*, 2008 WL 11380232, at *4 (citing *Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475 (1998); *ABM Farms, Inc. v. Woods*, 81 Ohio St. 3d 498, 502 (1998)).  Concealment of a material fact may also support a fraud claim, absent a fraudulent representation, where there is a duty to disclose.  *See Eaton Corp. v. Angstrom Auto. Grp., LLC*, 714 F. Supp. 3d 886, 907 (N.D. Ohio 2024) (citing *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 478 (6th Cir. 2014) and *Metro. Life Ins. Co. v. Triskett Ill., Inc.*, 97 Ohio App.3d 228, 646 N.E.2d 528, 532 (1994)).

"A genuine issue for trial exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Muncie Power Prod., Inc.*, 328 F.3d at 873 (quoting *Anderson*, 477 U.S. at 248). Thus, for Keystone to avoid summary judgment, "there must be evidence on which the jury could reasonably find for . . . [Keystone]." *Anderson*, 477 U.S. at 252. At trial, Keystone would be required to establish the elements of fraud by clear and convincing evidence. *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 754 (S.D. Ohio 2021) (citing *Rapport v. Kochovski*, 923 N.E.2d 1212, 1215 (2009)).

The record before this Court contains the following evidence regarding the allegedly false and material representations[4] made by Myers and relied upon by Keystone:

- Slater avers that Myers made multiple statements during the meetings leading to the Distributorship Agreement "that Davey Kent had the personnel and money to fulfill Keystone's orders." (Slater Aff., p. 3, ¶ 7.) Keystone reportedly relied on these statements when it executed the Distributorship Agreement with Davey Kent and the purchase orders for the initial 525 and 725 machines. (*Id.*)

- After Keystone's refusal to agree to a leasing program through the Bank of the Internet, Slater avers that Myers "continued to promise performance and press for more machine orders." (*Id.* at p. 4, ¶ 13.) Keystone reportedly relied on these promises when it ordered a second 725 machine and third 525 machine. (*Id.*)

The record also contains evidence to support a finding that Keystone suffered injury resulting from its reported reliance on Myers's representations, as Keystone paid over $1 million toward five machines and various parts but only received one machine and some parts. (Slater Aff., p. 5, ¶¶ 14, 16; ECF Doc. 59-2, pp. 9-11 (Ex. 2).)

---

[4] Slater also avers that Myers "did not disclose to Keystone that he and Davey Kent were in financial difficulty" and "did not disclose that he was being advised by a convicted felon, Michael Sichenzia[.]" (*Id.* at p. 3, ¶ 9.) Keystone reportedly would not have signed the Distributorship Agreement, placed the purchase orders, or done business with Myers and Davey Kent if it knew that Myers and Davey Kent were in financial difficulty and that Myers was being advised by Sichenzia. (*Id.* at p. 4, ¶ 9.) Because Kestone has not argued or otherwise demonstrated that there was a duty to disclose, and because the present motion can be resolved without addressing the issue, the Court will not consider whether the asserted failure to disclose the above facts is sufficient to support Keystone's fraud claim.

Although Myers does not further develop his assertion that "Keystone cannot point to any misrepresentations made by Myers" in the law and argument section of his brief (ECF Doc. 58, p. 11), he does make the following argument in the factual background section of his brief:

> When the Keystone-designated representative was asked about specific representations it alleges were made by Myers, he could not identify any. He merely identified generally that Davey Kent promised it could manufacture drilling machines and failed to do so.  Further, he consistently used communications from individuals who were not Myers to support that claim.  Moreover, nearly all the alleged communications between Davey Kent (or Myers) and Keystone occurred *after* the parties consummated their distributorship agreement and *after* Keystone had ordered drilling machines from Davey Kent.

(*Id*. at p. 9 (emphasis in original) (citations omitted).)

Unfortunately, none of Myers's above assertions regarding the relevant deposition testimony are supported by admissible evidence in the record before this Court.  The assertions are all allegedly based on a deposition transcript that Myers said he would "supplement[] upon receipt."  (*Id.*)  But Myers did not file a copy of the deposition transcript or supplement his arguments with citations to that transcript, although Keystone filed two deposition transcripts in support of its brief in opposition (ECF Doc. 60) and Myers subsequently submitted a reply brief (ECF Doc. 62).  As there is no admissible evidence before the Court to support Myers's assertions regarding the contents of Slater's deposition testimony, there is no evidence in the record to undermine the averments in the Slater affidavit regarding Myers's alleged misrepresentations.  *See Raimey v. City of Niles*, 676 F. Supp. 3d 547, 566 (N.D. Ohio 2022), *aff'd sub nom. Raimey v. City of Niles, Ohio*, 77 F.4th 441 (6th Cir. 2023) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.") (quoting Fed. R. Civ. P. 56(c)(1)).

18

Based on the evidence discussed above, the Court finds Keystone has presented sufficient evidence to support a jury finding that Myers made representations that were material to the transactions at hand, that Keystone justifiably relied on those representations, and that Keystone suffered injury as a result.  That leaves two questions remaining under Ohio's fraud standard: (1) whether the representations were made falsely, with knowledge of their falsity, or with such utter disregard as to whether they are true or false that knowledge may be inferred; and (2) whether the representations were made with the intent to mislead another into relying upon them.  *See Williams*, 83 Ohio St. 3d at 475; *ABM Farms,* 81 Ohio St. 3d at 502.  Because evidence of intent is difficult to obtain, "courts may infer fraudulent intent from the facts and circumstances surrounding the transaction and the relationship of the parties."  *Hitachi Med. Sys.*, 2008 WL 11380232, at *8 (citing *Stein v. Brown*, 18 Ohio St. 3d 305, 308-09 (1985)).

Keystone argues that the following evidence is sufficient to support a jury's finding that Myers knew Davey Kent did not have the ability to perform under the Distributorship Agreement and purchase orders when he represented that Davey Kent was able to perform, and that Myers intended for Keystone to rely on those misrepresentations:

- "Myers almost immediately turned to Sichenzia after execution of the [Distributorship Agreement] and the initial purchase orders for help in finding the money to meet the obligations to Keystone" (ECF Doc. 59, p. 14 (citing Myers Depo. Vol. I, Page ID # 437-38, pp. 85:24-86:2 ("We felt what we needed to do was to find ways to accelerate cash in the company to help us perform on our commitments to Keystone."); ECF Doc. 60-1, pp. 277-98 (Exs. 8A-8E));

- "Myers and Davey Kent apparently did not have the assets to secure traditional financing so Myers and Sichenzia contracted to Durham [to] factor loans against Keystone's orders" (ECF Doc. 59, p. 14; *see* ECF Doc. 37-3);

- Even though the Factoring Agreement with Durham already "put Keystone in the uncomfortable position of having the machines it paid for as the means to generate the cash to build them," Myers and Sichenzia later proposed a "[Bank of the Internet] leasing plan which would have left Keystone even more exposed" (ECF Doc. 59, p. 14 (citing ECF Doc. 60-1, pp. 415-25 (Ex. 31); Slater Aff. p. 4, ¶ 11 ("Keystone

refused [the leasing plan] because it placed Keystone in the position to have to finance the manufacture of machines it had already paid for.");

- "Despite the receipt of over a million dollars of Keystone's money and the advances from Durham, Davey Kent still could not perform beyond the initial 525 machine delivered five months late and some parts" (ECF Doc. 59, p. 14); and

- "Myers' fraudulent intent . . . is perhaps best demonstrated by the triple sale of the initial 725 machine Keystone fully paid for but never received" (ECF Doc. 59, p. 15 (citing Slater Aff., p. 6, ¶ 17; Myers Depo. Vol. II, Page ID # 810, p. 195:5-15; *id.* at Page ID # 814, p. 199:1-4, 20-24; *id.* at Page ID #815, p. 200:17-21).

Myers argues that the above evidence is insufficient to defeat summary judgment because: (1) there is no evidence that Sichenzia was involved in any fraud relating to Keystone, and the evidence shows instead that "Sichenzia was merely involved in obtaining financing which Davey Kent hoped would provide it additional liquidity to speed up its drill manufacturing operation" (ECF doc. 62, p. 3); (2) the Myers affidavit provides "evidence that Myers did not personally make any misrepresentation necessary to satisfy an essential element of a fraud claim" since "Keystone barely spoke with Myers prior to consummating its deal with Davey Kent and prior to submitting its orders" (*id.* at pp. 3-4); and (3) "[n]othing in the Davey Kent-Keystone relationship prohibited Davey Kent from financing its operations" and "[t]here is nothing unusual about a manufacturer having lines of credit from which to draw" (*id.* at 4-5).

As to the first argument—that Sichenzia's help in seeking financing for Davey Kent does not create a genuine issue of fact as to whether Myers committed fraud—the Court finds that the evidence in the present record regarding Myers's interactions with Sichenzia in seeking various forms of financing to fund the construction of Keystone's machines could reasonably factor into a jury's determination that Myers made knowing misrepresentations when he said Davey Kent had the financial ability to perform on the Distributorship Agreement and purchase orders.

For example, Myers emailed Sichenzia about using the new relationship with Keystone to secure financing through a factoring agreement just days after the Distributorship Agreement

20

was executed and Keystone made its first 30% deposits on two purchase orders (ECF Doc. 60-1, pp. 277-98 (Exs. 8A-8E)), with Myers testifying that his purpose was to "find ways to accelerate cash in the company to help [them] perform on their commitments to Keystone" (Myers Depo. Vol. I, Page ID # 437-39, pp. 85:9-87:6).  A jury could reasonably infer from the timing of the communications and the nature of the financing that Myers knew his prior statements during contract discussions "that Davey Kent had the personnel and money to fulfill Keystone's orders" (Slater Aff., p. 3, ¶ 7) were false, and intended that Keystone rely on those statements.

Further evidence indicates that Myers later worked with Sichenzia to propose a Bank of the Internet lease agreement that would finance not only new machine orders, but also previously ordered machines for which Keystone had already paid, and which had already been used to generate financing through the Factoring Agreement.  (Myers Depo. Vol. I, Page ID # 495-97, pp. 143:18-145:21; *id.* at Page ID #501, p. 149:16-25; ECF Doc. 60-1, pp. 406-14 (Ex. 30); ECF Doc. 60-2, pp. 94-95 (Ex. 37) (noting the proposed Bank of the Internet arrangement "could even be used with the current machines on order").)  Given that Keystone had already made payments toward the existing orders, and those orders had also been used to generate additional financing through the Factoring Agreement, Davey Kent's new request that Keystone enter into a Bank of the Internet leasing arrangement that "could even be used with the current machines on order," i.e., to obtain further financing based on the same orders, could support a reasonable inference by a jury that Myers knew Davey Kent lacked the financial wherewithal to perform on additional purchase orders when he reportedly "continued to promise performance and press for more machine orders."  (*Id.* at p. 4, ¶ 13.)

For the reasons discussed above, the Court finds that the evidence concerning Myers's coordination with Sichenzia to seek financing intended to fund Davey Kent's performance under

the Distributorship Agreement and purchase orders could support a reasonable inference by a jury that Myers knowingly misrepresented Davey Kent's financial viability with the intent to influence Keystone's decision to enter the relevant business dealings.

Myers's second argument—that his affidavit proves he did not personally make any of the alleged misrepresentations—is not consistent with the admissible evidence in the record before this Court.  In his affidavit, Myers admits to being introduced to Keystone representatives as Davey Kent's president when they visited Davey Kent's facilities in Kent, Ohio (Myers Aff., p. 3, ¶ 14), but notes that "David Myers primarily dealt with Keystone, not me" (*id.* at ¶ 16). Although these attestations may support a claim that Myers had minimal communications with representatives of Keystone, the affidavit does not affirmatively prove that Myers did not have any communications with Keystone representatives.  Conversely, the Court finds Keystone has offered sufficient evidence to create a genuine issue of material fact as to whether Myers repeatedly stated during the meetings leading to the execution of the Distributorship Agreement "that Davey Kent had the personnel and money to fulfill Keystone's orders" (Slater Aff., p. 3, ¶ 7) and/or "continued to promise performance and press for more machine orders" after Keystone refused to agree to a leasing program through the Bank of the Internet (*id.* at p. 4, ¶ 13).[5]

As to Myers's final argument—that there is nothing unusual about a manufacturer having lines of credit, and that nothing in the Davey Kent / Keystone relationship prohibited Davey Kent from financing its operations—is beside the point.  Because intent is difficult to demonstrate using evidence, "courts may infer fraudulent intent from the facts and circumstances surrounding the transaction and the relationship of the parties." *Hitachi Med. Sys.*, 2008 WL 11380232, at *8

---

[5] As discussed above, Myers's descriptions of testimony that was reportedly elicited in Slater's deposition to undermine the statements in his affidavit cannot be considered in support of the pending motion because Myers failed to submit admissible evidence—such as the relevant deposition transcript—to support his arguments.

(citing *Stein*, 18 Ohio St. 3d at 308–09).  Here, the facts and circumstances highlighted by Keystone and supported by admissible evidence in the record could reasonably support a finding that Myers: represented during initial contract negotiations that Davey Kent had the personnel and money to fulfill Keystone's initial purchase orders; but then, only days after the contract was signed and Keystone's initial payments were made, sought to leverage those purchase orders to finance Davey Kent's performance on the orders; several months later, having still not performed on the orders, sought additional financing to leverage the same orders to—again—finance Davey Kent's performance on the same orders; after Keystone rejected the additional financing arrangement, continued to promise performance and press for more machine purchase orders; ultimately failed to deliver four out of five of the ordered machines, despite receiving payments in excess of $1 million; and later sold a 725 machine that Keystone had paid for in full to two unrelated companies, receiving additional cash payments in excess of $600,000, instead of delivering the machine to Keystone.  The Court finds that a juror could reasonably infer from these facts and circumstances that Myer knew Davey Kent did not have the personnel and money necessary to perform on the Distributorship Agreement and/or purchase orders but represented to Keystone that Davey Kent had the financial wherewithal to perform with the intent to induce Keystone to rely on the representations and make payments toward the purchase orders.

For the reasons discussed above, the Court finds that Keystone has presented sufficient evidence for a jury to reasonably conclude that Myers knowingly misrepresented Davey Kent's ability to perform under the terms of the Distributorship Agreement and purchase orders with the intent to induce Keystone to pay money to purchase machines that Myers knew Davey Kent did not have the financial ability to manufacture and deliver as agreed, and that Keystone acted upon those representations to its detriment.  Thus, Keystone has presented material questions of fact

23

upon which a reasonable jury could return a verdict for Keystone on the fraud claim set forth in Count Six of the Amended Complaint.

## IV.    Conclusion

For the reasons set forth above, the Court **DENIES** Defendant J. Thomas Myers II's Motion (ECF Doc. 58).

November 7, 2024

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

24